IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MIGDALIA FELICIANO MARTIZ,<br><br>Plaintiff<br><br>v.<br><br>HON. KABIR SOLARES GARCIA, Mayor of the Municipality of Anasco in his official and personal capacities, IRIS Y. PEREZ CRESPO, Director of Human Resources of the Municipality of Anasco in her official and personal capacities, THE MUNICIPALITY OF ANASCO, and JEAN DOE and PAT DOE, municipal employees, contractors or agents in their official and personal capacities,<br><br>Defendants | Civil No. ____-cv-_____ (____)<br><br>42 U.S.C.A. §§1983, 1985 and Puerto Rico Act 115-1991- prohibited discrimination and retaliation in public employment, conspiracy, claim for damages and injunctive relief.<br><br>Jury trial demanded |

**COMPLAINT**

**TO THE HONORABLE COURT:**

**COMES NOW** Plaintiff Migdalia Feliciano Martiz, through the undersigned attorney, and respectfully states, alleges and prays:

### I.   PRELIMINARY STATEMENT

1. This is a case of political coercion and how easily a small-town mayor can exact retribution against a career municipal employee who dared to cross political lines.

1

2.    Defendant Mayor Kabir B. Solares Garcia, of the New Progressive Party, weaponized the machinery of municipal government, including using his personnel authority and digital media operated by employees or municipal contractors, to remove Plaintiff from public employment on the eve of her retirement after twenty-five (25) years of exemplary service.

3.    Plaintiff's "offense" was asserting her political independence. Although historically affiliated with the New Progressive Party ("NPP"), in 2008 she agreed to serve in leadership roles under a Popular Democratic Party ("PDP") mayor after being recruited based on merit. She supported that administration in subsequent elections based on performance rather than party loyalty.

4.    When Defendant Solares Garcia, an NPP mayor, assumed office in 2021, retaliation began almost immediately. Plaintiff was isolated, humiliated, and subjected to unsafe working conditions, publicly stigmatized, and ultimately terminated through a sham disciplinary process.

5.    The Mayor himself told Plaintiff, "That's what you get for voting for the other party." An agent assigned to her office to harass her stated: "La voy a sacar" ("I will get rid of her"). The Mayor literally flashed his concealed weapon at Plaintiff when she complained about her working condition. And Plaintiff was ultimately accused falsely of causing her supervisor's death and branded a "danger to the people of Añasco."

2

6. As absurd and conscious shocking as these accusations sound, Defendant Mayor succeeded in destroying Plaintiff's public service career.

7. Plaintiff was targeted for her age, for her religious beliefs, for her complaints about unsafe working conditions and irregularities in the administration of municipal services and for being disloyal to the New Progressive Party and/or the faction led by Defendant Mayor Solares Garcia.

8. At age sixty-four (64), only months from retirement eligibility, Plaintiff was stripped of her livelihood, her pension trajectory, and her professional reputation through a coordinated misuse of municipal authority.

9. Because the other institutions charged with protecting her rights failed to do so, Plaintiff seeks relief from this Honorable Court.

## II.    JURISDICTION AND VENUE

10. This action arises under the Constitution and laws of the United States, including the First and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 1985.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), and 42 U.S.C. §§ 1983 and 1985.

12. The Court has supplemental jurisdiction over Plaintiff's Puerto Rico law claims pursuant to 28 U.S.C. § 1367.

13. Plaintiff also seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rule of Civil Procedure 65.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in this District and all Defendants reside in this District.

### III.    THE PARTIES

15. Plaintiff Migdalia Feliciano Martiz is a resident of Añasco, Puerto Rico, and was a career municipal employee at all relevant times.

16. Defendant Municipality of Añasco is a municipal corporation organized under the laws of Puerto Rico.

17. Defendant Kabir Solares García is the Mayor of Añasco and the final policymaker with respect to municipal employment decisions. He is sued in his individual capacity for damages and in his official capacity as the final policymaker for the municipality and for declaratory and injunctive relief.

18. Defendant Iris Pérez Crespo is the Director of Human Resources for the Municipality of Añasco. She is sued in her individual capacity for damages and in her official capacity to the extent she participated in or ratified the unconstitutional conduct described herein.

19. Defendants Jean Doe and Pat Doe are municipal employees, contractors, or agents of the Defendant Mayor who participated in or facilitated the unconstitutional acts alleged herein, including harassment and retaliatory use of digital media. Upon information and

4

belief, they acted under color of state law and are sued in their official and individual capacities.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiff's Background, Qualifications, and Political History

20. Plaintiff devoted approximately twenty-five (25) years to public service with the Municipality of Añasco.

21. At the time of her termination on February 21, 2025, Plaintiff was sixty-four (64) years old and only months away from eligibility for retirement benefits.

22. Plaintiff holds a master's degree in education and a master's degree in Pastoral Counseling.

23. Plaintiff consistently received excellent performance evaluations.

24. A formal evaluation by her direct supervisor dated April 19, 2024, stated the following regarding her performance:

   a. She required minimal supervision, as her work was accurate and precise.
   b. She learned quickly and demonstrated initiative by suggesting new ways of doing things.
   c. She was characterized by high ideals and strict adherence to the principles of public policy, the law, and morality.
   d. She always appeared well groomed, maintaining exceptional neatness, cleanliness, and order in her work area.
   e. She was receptive to instructions and learned and performed her duties quickly.
   f. She consistently made an effort to meet her goals and demonstrated full knowledge of all phases of her work.
   g. She collaborated effectively in achieving the objectives of the municipality.

    h.   She always fulfilled her job duties and was even available for overtime and additional work.

    i.   She performed very well under pressure and efficiently resolved matters during moments of crisis.

    j.   She assumed responsibilities with minimal or no supervision and was entrusted with tasks with confidence.

25. Plaintiff historically identified with the NPP and attended political activities sponsored by that party in Añasco.

26. Her husband ran for public office as an NPP candidate.

27. After the Popular Democratic Party candidate won the 2008 mayoral election, that Mayor personally recruited Plaintiff to direct the Municipality's Senior Center and the federally funded children's center.

28. Under the PDP Mayor, Plaintiff served as Director of various municipal dependencies, including the Office of Federal Programs for twelve (12) years.

29. When asked why he recruited her despite her identification with the NPP, the former Mayor told Plaintiff he was "Mayor of the whole town, not just of the Popular Democratic Party."

30. Plaintiff supported that Mayor in three subsequent election cycles based on his performance.

31. Plaintiff's support for the prior PDP mayoral administration and her political independence were openly known within the Municipality.

### B.    Change in Administration and Retaliation

32. When Defendant Kabir Solares García won the 2020 mayoral election and assumed office in January 2021, Plaintiff was serving in a trust position.

33. Upon the change in administration, Plaintiff was removed from her trust position and reinstated to her career position as Office Clerk.

34. Plaintiff's career position is subject to for-cause protections under Puerto Rico law and municipal regulations.

35. Plaintiff was initially assigned to work inside a raised truck trailer under unsafe and unsuitable conditions.

36. Plaintiff filed a complaint with Puerto Rico Occupational Safety and Health authorities regarding those unsafe working conditions.

37. OSHA authorities ordered the Municipality to relocate Plaintiff.

38. Rather than correcting the retaliation, Defendants reassigned Plaintiff to an abandoned school facility, isolated from other employees and removed from the normal administrative environment.

39. Plaintiff was required to park outside the facility's designated parking lot while other employees were permitted to park inside.

40. When Plaintiff asked Defendant Mayor Solares García why she alone was not permitted to park inside, he responded: "That's what you get for voting for the other party."

7

41. During that interaction, the Mayor flashed his revolver at Plaintiff in a manner she perceived as intimidating.

### C.    Transfer to Municipal Cemetery and Campaign to Force Resignation

42. In 2022, Plaintiff was transferred to the administrative office of the Municipal Cemetery.

43. At the Cemetery, Plaintiff was subjected to bullying and harassment by agents of Defendant Mayor Solares García and notified Defendant Perez Crespo of her complaints.

44. Vilma Ramírez, a temporary municipal employee, stated to others that she had been sent to the Cemetery with a special assignment from the Mayor to force Plaintiff to resign, stating in Spanish: "La voy a sacar" ("I will get rid of her")

45. Plaintiff was aware of these statements and reasonably understood them as part of a coordinated effort to remove her from municipal employment.

46. Plaintiff's evaluations continued to reflect satisfactory or excellent performance despite the hostile environment.

### D.    Whistleblowing and Escalation

47. Plaintiff engaged in protected reporting activity concerning workplace safety and irregular municipal practices.

48. Plaintiff filed a complaint with the Puerto Rico Occupational Safety and Health Administration regarding unsafe and unhealthy conditions.

49. Plaintiff was interviewed by the Office of the Comptroller of Puerto Rico regarding irregular administrative conduct at the Municipal Cemetery.

50. In September and October 2024, Plaintiff reported to Defendant Pérez Crespo that she was being harassed and that her rights were being violated, and she advised that she was considering legal action. No corrective action was taken.

### E.    Initial Disciplinary Proceeding

51. In January 2023, municipal authorities initiated disciplinary proceedings against Plaintiff, alleging that she had failed to comply with supervisory directives and had spoken negatively about the municipal administration and the Mayor during work hours.

52. A hearing was conducted on February 23, 2023. In a written report dated March 29, 2023, the Hearing Officer characterized Plaintiff as displaying a "defiant attitude toward authority" and being uncooperative with her supervisor and coworkers.

53. The 2023 Report explicitly acknowledged that Plaintiff alleged she had filed a complaint with OSHA and that since doing so she had been treated differently. The Report stated that Plaintiff was "attempting to justify" the disciplinary actions as retaliation.

54. The Hearing Officer recommended only a written reprimand, but the report formally placed Plaintiff under progressive disciplinary scrutiny and memorialized her protected complaints in the municipal record.

### F.    Religious and Gender-Based Hostility

55. Plaintiff is a Christian pastor and leads a church congregation in Añasco, Puerto Rico. She is a female religious leader.

56. During Defendant Solares García's administration, Plaintiff experienced adverse treatment connected to her role as a female pastor.

57. Upon information and belief, municipal officials denied Plaintiff authorization to conduct prayer meetings in the public plaza, while permitting comparable secular or political uses of the same public space.

58. Upon information and belief, Defendant Mayor caused or allowed political campaign materials to be posted on property associated with Plaintiff's church without authorization.

59. As described below, Plaintiff was also targeted through social media posts that attacked her as a "PASTOR of the DEVIL" reinforcing hostility tied to her religious role.

60. These acts occurred during the same period in which Plaintiff was experiencing escalating disciplinary scrutiny and retaliation in her municipal employment.

61. The timing and pattern of these actions demonstrate hostility directed at Plaintiff not only for political reasons, but also because of her identity as a female religious leader.

### G.    Fabricated Charges, Sham Hearing, and Termination

62. On or about December 2, 2024, Plaintiff's direct supervisor, Mr. S.A.A., assigned her a task that Plaintiff reasonably believed should have been assigned to Vilma Ramírez. When

10

Plaintiff questioned the assignment, the supervisor yelled at her that he had assigned the task to her.

63. Shortly thereafter, a municipal marshal arrived and instructed the supervisor to report to City Hall for a meeting.

64. The following day, December 3, 2024, the supervisor suffered a medical emergency at the office while Plaintiff was elsewhere in the Cemetery facility.

65. Plaintiff was not present during the medical event, and multiple witnesses corroborated her absence.

66. Nevertheless, when Plaintiff attempted to return to work the next day, she was stopped by a municipal police officer. The officer told her she could not return to work for ten (10) days and handed her a letter from the Mayor stating that she was considered a "danger to the people of Añasco."

67. The December 4th letter, signed by Defendant Mayor was titled "Notification of Summary Suspension of Employment and Proposal for the Formulation of Charges," asserting that Plaintiff "instigated altercations and physically attacked" her supervisor, that the incident caused him "serious health complications" requiring emergency care, and that there was a "reasonable basis" to conclude Plaintiff posed a "real danger to the health, life, and/or morale" of employees and the public, and proposing charges up to dismissal.

68. Plaintiff was not informed at that time of any specific factual allegation of wrongdoing.

69. Defendants initiated disciplinary proceedings against her based on this alleged incident involving Plaintiff's supervisor.

70. Defendants insinuated, without evidence, that Plaintiff caused or contributed to Mr. Avilés Acosta's medical emergency and later death.

71. A hearing officer selected and controlled by Defendants conducted a purported investigation.

72. The hearing officer relied on hearsay, vague allegations, and improper evidence, ignored exculpatory testimony, and failed to identify specific misconduct.

73. Plaintiff was not provided advance written notice of the specific factual allegations forming the basis of the proposed termination, including the allegation that she had brandished a knife the day before her supervisor's medical emergency and that this alleged action caused his heart attack the following day.

74. Plaintiff was not provided copies of the written declarations or other evidence upon which the Municipality relied prior to or during the disciplinary hearing.

75. Plaintiff was therefore unable to prepare a defense to the specific allegations or meaningfully respond to the evidence against her.

76. Plaintiff was denied the opportunity to confront or cross-examine adverse witnesses whose written statements were relied upon by the Hearing Officer.

77. The disciplinary process did not provide a meaningful opportunity to be heard before a neutral and impartial decision-maker.

78. The Hearing Officer's February 18, 2025 Report relied upon written declarations and factual findings that were never disclosed to Plaintiff prior to the issuance of the recommendation.

79. Only after receiving the hearing officer's determination did Plaintiff learn she was accused of brandishing a knife in the office the day before the supervisor's medical emergency.

80. During the disciplinary hearing, Plaintiff was never questioned about a knife.

81. No witness testified that Plaintiff possessed or brandished a knife and no physical evidence was introduced by the Municipality.

82. Plaintiff was not afforded the opportunity to confront or cross-examine any declarant regarding such allegation.

83. Plaintiff was the only party who presented a witness in her defense.

84. The hearing officer disregarded that testimony without explanation.

85. Plaintiff later learned that all the employees at the Cemetery had been asked to sign written declarations regarding the alleged knife incident. One employee told Plaintiff that he refused to sign. Three short-term contract employees did sign the written statements.

86. The knife allegation was never raised with Plaintiff in advance of termination and appears to have been manufactured to justify a predetermined decision.

87. After the hearing held in February 2025, the Hearing Officer issued a written report dated February 18, 2025 recommending Plaintiff's termination.

88. In that Report, the Hearing Officer made the following express finding:

**"Quedó demostrado que como consecuencia de los actos realizados por la empleada, su supervisor sufrió serios percances de salud al punto que al día siguiente de los hechos, el 3 de diciembre de 2024, le sobreviniera un ataque al corazón."**

The foregoing translates as:

**"It was demonstrated that, as a consequence of the acts carried out by the employee, her supervisor suffered serious health complications to the extent that, on the day following the events, December 3, 2024, he suffered a heart attack."**

89. The Report thus expressly attributed the supervisor's heart attack to Plaintiff's alleged conduct.

90. The February 18, 2025 Hearing Officer's Report further made the following factual determination:

14

> **"Quedó establecido que la empleada ostenta un puesto de carrera dentro del Municipio de Añasco, pero en administraciones pasadas había fungido como directora de varias dependencias municipales o empleada de confianza, entre los años 2008 y 2020."**

The foregoing translates as:

> **"It was established that the employee holds a career position within the Municipality of Añasco, but in prior administrations she had served as director of various municipal departments or as a trust employee between the years 2008 and 2020."**

91. This finding was adopted by Defendant Solares García as part of the official termination decision.

92. The Hearing Officer further concluded that Plaintiff's conduct posed a "real danger to the health, life, and/or morale" of municipal employees and the public, and that it was "clearly and conclusively demonstrated" that she committed each of the charged violations.

93. The Hearing Officer rejected Plaintiff's testimony as not deserving of "even an iota of credibility" and recommended "la destitución de empleo" (dismissal from employment).

94. On February 21, 2025, Defendant Mayor Solares Garcia adopted the hearing officer's report and terminated Plaintiff, effective February 22, 2025.

95. The findings that Plaintiff caused or contributed to her supervisor's medical emergency and that she posed a danger to others were memorialized in official municipal records and served as the formal basis for her termination.

15

96. Plaintiff was sixty-four (64) years old and approaching retirement eligibility. As a direct and foreseeable consequence of this termination, Plaintiff lost accrued retirement credits, pension eligibility, and associated retirement benefits earned through decades of public service, resulting in substantial and continuing economic harm.

97. The sequence of reassignments, threats, disciplinary escalation, and stigmatizing charges supports the inference that Defendants sought to force Plaintiff out through pretext.

**H.  Retaliatory Use of Digital Media**

98. On December 3, 2024, the same day Plaintiff's supervisor suffered a medical emergency, a social media page published statements accusing Plaintiff of causing harm to another individual and portraying her as morally corrupt and spiritually unfit in her capacity as a religious leader. The post invoked religious condemnation and public moral denunciation. The social media posts attacking Plaintiff referenced her role as a female pastor and portrayed her religious leadership in a hostile and derogatory manner.

99. The content of the December 3, 2024 publication is reproduced verbatim in English below:

> **Las Tetas de la Gorda**
> December 3, 2024
> SHE-PASTOR of the DEVIL, because of you today there is a person in serious condition in the hospital. You have a heart as black as the night; you are evil and diabolical. You hide behind an altar, but your days as a SHE-PASTOR are ending soon because you are not a human being — you are a demon sent by Satan himself, sent from the deepest black abysses of hell… 😡😡😡

[Reposting the following:]
**Brendalee Daly Torrellas**
2h
There is nothing worse than feeling the presence of satanic legions and that negative air all concentrated in a human being who claims to serve God.
As the Word says, the day will come when no matter how many hallelujahs or temples you have, God will tell you: "Depart from me, you worker of evil, for I never knew you."
How sad and infuriating to see someone who claims to be a pastor mock the misfortune of others.
Your soul is already ready for judgment; you are in a stupor, not understanding what is coming upon you. God's time is coming for your house.

100.     Although the opening portion of the post did not initially include Plaintiff's full name, the accompanying comments explicitly identified Plaintiff by full name and photo and attributed responsibility to her for the supervisor's medical emergency, leaving no ambiguity as to the subject of the accusations.

101.     The publication occurred before the completion of any formal investigation and before the issuance of formal disciplinary findings.

102.     Upon information and belief, the page is administered by Defendants Doe, one or more municipal employees or contractors acting under color of state law, at the direction of, or with the knowledge and approval of, Defendant Solares García.

103.     Upon information and belief, the page regularly publishes information concerning internal municipal matters not available to the general public and has been used

17

to attack municipal employees, including Plaintiff, perceived as politically disloyal. The tone, timing, and content of the posts reflect knowledge of non-public municipal proceedings.

104.     Upon information and belief, Defendant Solares García follows, interacts with, and benefits politically from the page, which publishes material supportive of his political campaign and hostile to perceived opponents.

105.     The December 3, 2024 publication preceded the issuance of formal disciplinary findings and reinforced the public narrative later memorialized in the February 18, 2025 Hearing Officer's Report, including the allegation that Plaintiff's conduct caused her supervisor's heart attack.

106.     The use of digital media in this manner functioned as an extension of Defendants' employment authority and further stigmatized Plaintiff in connection with her termination.

107.     The use of digital media in this manner also chilled and continues to chill protected political activity and whistleblowing.

108.     To this day, the page has not removed or disavowed the identifying publication and comments and has permitted them to remain publicly visible.

### I.     Conspiracy to Violate Civil Rights

109.     Defendants knowingly agreed and acted in concert to remove Plaintiff from public employment through a coordinated course of conduct.

110.    In furtherance of that objective, Defendants reassigned Plaintiff to unsafe and isolating workspaces, subjected her to retaliatory scrutiny and discipline following her protected complaints; procured false statements regarding the alleged knife incident; relied on undisclosed evidence during disciplinary procedures; adopted a sham investigation and report without independent review; and used digital media to amplify stigmatizing accusations contemporaneous with the internal disciplinary narrative.

111.    Each of these actions required communication, coordination, and shared intent among the Mayor, the Director of Human Resources and other municipal agents involved in the administration of the social media page.

112.    Defendant Solares Garcia ratified and consummated the coordinated conduct by adopting the hearing officer's February 18, 2025 report and terminating Plaintiff without independent review.

113.    As the direct and foreseeable result, Plaintiff's employment was terminated and she was deprived of her constitutional rights.

### J.    Municipal Policy or Custom

114.    Plaintiff's termination was not an isolated personnel decision, but the foreseeable result of a municipal policy, custom, or practice of political patronage and retaliation enforced by the Municipality of Añasco through its final policymakers and implemented through disciplinary and administrative mechanisms.

115.    Defendant Solares García, as Mayor of Añasco, possessed final policymaking authority under Puerto Rico law with respect to personnel discipline, termination decisions, and the adoption of hearing officer findings. His decision to adopt and ratify the February 18, 2025 Hearing Officer's Report constituted the official act of the Municipality.

116.    The disciplinary process employed against Plaintiff, including reliance on undisclosed written declarations, denial of confrontation of adverse witnesses, pre-formation of investigative conclusions, and adoption of stigmatizing findings unsupported by physical evidence, reflects a municipal practice of using disciplinary mechanisms as instruments of political retaliation.

117.    The premature public dissemination of accusations on December 3, 2024 through digital media administered, upon information and belief, by municipal employees or contractors further reflects the use of municipal instrumentalities to reinforce and formalize a retaliatory narrative.

118.    Upon information and belief, the use of municipal personnel, authority, and digital platforms to discipline or publicly discredit employees perceived as politically disloyal constitutes a recurring municipal custom.

119.    Political patronage and discrimination in Puerto Rico, particularly at the municipal level, are widely documented, extensively studied, and repeatedly recognized by federal courts as pervasive and systemic, rather than aberrational. Legal scholarship has

20

described Puerto Rico's municipalities as operating within a deeply entrenched spoils system in which public employment decisions are routinely conditioned on political loyalty, factional alignment, or acquiescence to political power. See, e.g., Alexandra Sabater Baerga & Jean R. Santiago Cruz, *A Spoiled Spoils System: Puerto Rico's Epidemic of Political Discrimination and the Federal Courts*, 85 REV. JUR. U.P.R. 1327 (2016) (documenting the historical persistence, scale, and judicial recognition of political discrimination in Puerto Rico's public employment).

120.    Research further demonstrates that political discrimination in Puerto Rico persists despite constitutional and statutory merit protections, operating instead through informal mechanisms, executive discretion, retaliatory discipline, and sham administrative processes. These practices are structural rather than incidental and are designed to consolidate political control and deter dissent within the public workforce. See Stephen A. Plass & Naomy M. Rivera, *Executive Power and Patronage: Lessons from Puerto Rico*, 52 UC LAW SF CONST. Q. 80 (2024) (describing the existence of a formalized patronage apparatus operating alongside merit rules and sustained through executive authority).

121.    Political retaliation frequently manifests not only across party lines but through intra-party factionalism, including punishment of employees who refuse to support dominant local factions, decline political mobilization, or maintain political neutrality. Employees perceived as insufficiently loyal are routinely treated as disfavored regardless of

formal party registration. See id.; see also Nevbahar Ertas, *Perceptions of Political Discrimination and Political Activity Coercion in the Federal Service*, 52 PUB. PERS. MGMT. 1 (2026) (analyzing political coercion and retaliation as mechanisms for enforcing loyalty and suppressing neutrality).

122.    This scholarship further identifies municipal executives, particularly mayors, as the primary enforcers of patronage systems, exercising appointment, disciplinary, and removal authority as final policymakers, while delegating implementation to human resources officials, hearing officers, and political operatives. See Plass & Rivera, *supra*.

123.    The documented consequences of municipal patronage systems include: erosion of merit protections; chilling of political expression and whistleblowing; systemic due process violations; and systemic procedural irregularities. See Sabater Baerga & Santiago Cruz, *supra*; Plass & Rivera, *supra*.

124.    The conduct alleged in this case reflects these structural patronage mechanisms described in that body of scholarship: Plaintiff was reassigned following a change in political administration; she was subjected to escalating disciplinary scrutiny after engaging in protected political and whistleblowing activity; stigmatizing accusations were publicly disseminated contemporaneously with internal disciplinary proceedings; and the final termination decision adopted findings attributing a supervisor's heart attack to

Plaintiff despite procedural irregularities. These actions were undertaken through formal municipal channels and ratified by the Mayor.

125.    Defendant Solares García, as Mayor of Añasco, possessed final policymaking authority over municipal employment decisions and ratified each step in the disciplinary process culminating in Plaintiff's termination.

126.    The coordinated conduct described herein was ultimately ratified and formalized by the Mayor's adoption of the February 18, 2025 Report, thereby converting the underlying misconduct into official municipal policy.

127.    The Mayor's decision to adopt the February 18, 2025 Hearing Officer's Report and to terminate Plaintiff constituted a final, unreviewable employment decision under Puerto Rico law and municipal regulations, and therefore represents official policy of the Municipality of Añasco for purposes of 42 U.S.C. § 1983.

128.    Defendant Pérez Crespo and other municipal officials acted pursuant to, and in furtherance of, this municipal policy or custom by facilitating retaliatory discipline, participating in procedural irregularities, and implementing the termination decision.

129.    The Municipality of Añasco is therefore liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), because Plaintiff's injuries were caused by decisions of a final policymaker pursuant to a longstanding municipal custom or practice of political

retaliation and ratification of unconstitutional conduct through formal adoption of the disciplinary findings.

## FIRST CAUSE OF ACTION:
## POLITICAL DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT (42 USC §1983)

130. Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

131. Plaintiff openly supported and campaigned for a mayoral candidate of the Popular Democratic Party in the election cycles preceding Defendant Solares García's election.

132. Defendant Solares García is affiliated with the New Progressive Party and was aware of Plaintiff's support for the opposing party's candidate.

133. It has long been clearly established that a public employer may not terminate or discipline a non-policymaking employee on the basis of political affiliation, political neutrality, or support for an opposing political candidate.

134. Following Defendant Solares García's assumption of office, Plaintiff was subjected to adverse employment actions, including multiple reassignments, escalating disciplinary proceedings, and ultimately termination on February 21, 2025.

135. Defendants were aware, as reflected in the February 18, 2025 Report adopted by the Mayor, that Plaintiff had served as a director and trust employee under prior administrations from 2008 to 2020.

136. Defendant Solares García directly referenced Plaintiff's political support for the opposing party in connection with adverse treatment.

137. Plaintiff's political affiliation and support for the opposing mayoral candidate were substantial or motivating factors in Defendants' decision to take adverse employment actions against her.

138. These actions were taken under color of law, knowingly and with malicious, willful and callous indifference to Plaintiff's rights secured under the Constitution of the United States.

139. The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

140. As a result of the Defendant's unconstitutional and illegal conduct, Plaintiff was illegally terminated from her employment and was caused irreparable and continuing emotional and economic harm.

## SECOND CAUSE OF ACTION:
## RETALIATION IN VIOLATION OF THE FIRST AMENDMENT (42 USC §1983)

141.    Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

142.    Plaintiff engaged in constitutionally protected activity, including: (a) exercising her right to political association and declining to support the NPP in the municipal election; and (b) speaking on matters of public concern, including reporting unsafe working conditions and irregular municipal practices to appropriate authorities.

143.    At all relevant times, it was clearly established that a public employer may not retaliate against an employee for engaging in protected speech on matters of public concern, including reporting unsafe working conditions and governmental irregularities.

144.    Defendants were aware of Plaintiff's protected political activity and whistleblowing.

145.    The disciplinary escalation followed Plaintiff's protected complaints and political non-alignment.

146.    Plaintiff suffered adverse employment actions, culminating in her termination.

147.    Plaintiff's protected conduct was a substantial or motivating factor in Defendants' decision to initiate disciplinary proceedings against her and to terminate her employment.

26

148.     These actions were taken under color of law, knowingly and with malicious, willful and callous indifference to Plaintiff's rights secured under the Constitution of the United States.

149.     The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

150.     As a result of the Defendant's unconstitutional and illegal conduct, Plaintiff was illegally terminated from her employment and was caused irreparable and continuing emotional and economic harm, including loss of employment, economic harm, reputational injury, and emotional distress.

### THIRD CAUSE OF ACTION:
### DEPRIVATION OF PROPERTY IN VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE OF THE FOURTHEENTH AMENDMENT (**42 USC §1983**)

151.     Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

152.     At all relevant times, Plaintiff was a career municipal employee of the Municipality of Añasco, removable only for cause under Puerto Rico law and municipal regulations.

153.     It has long been clearly established that a public employee who may be removed only for cause is entitled to notice of the charges, an explanation of the employer's evidence, and a meaningful opportunity to respond before termination.

154.     As a career employee, Plaintiff possessed a constitutionally protected property interest in her continued employment and in the associated accrual of retirement and pension benefits.

155.     Defendants terminated Plaintiff from her employment on February 21, 2025.

156.     Prior to termination, Plaintiff was not provided constitutionally adequate notice of the specific factual allegations against her, was not furnished the evidence upon which the Municipality relied, and was not afforded a meaningful opportunity to respond to the charges before an impartial decision-maker.

157.     The disciplinary process described in the factual allegations above failed to satisfy the minimum procedural safeguards required by the Fourteenth Amendment.

158.     Defendant Solares García adopted and executed the termination decision as final policymaker for the Municipality of Añasco.

159.     These actions were taken under color of law, knowingly and with malicious, willful and callous indifference to Plaintiff's rights secured under the Constitution of the United States.

160.     The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

161.     As a result of the Defendant's unconstitutional and illegal conduct, Plaintiff was illegally terminated from her employment and was caused irreparable and continuing emotional and economic harm, including loss of employment, loss of retirement accrual, economic harm, and emotional distress.

**FOURTH CAUSE OF ACTION:**
**DEPRIVATION OF LIBERTY INTEREST IN VIOLATION OF THE PROCEDURAL DUE PROCESS CLAUSE OF THE FOURTHEENTH AMENDMENT (42 USC §1983)**

162.     Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

163.     It has long been clearly established that when the government publicly disseminates false and stigmatizing accusations in connection with termination that seriously damage an employee's standing in the community, due process requires a meaningful opportunity to clear one's name.

164.     The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in pursuing her chosen occupations and in maintaining her good name, reputation, honor, and integrity when the government makes false and stigmatizing accusations in connection with termination of employment.

165. In connection with Plaintiff's termination, **Defendants formally accused her of engaging in violent and dangerous misconduct and expressly found that her actions caused her supervisor's heart attack.**

166. The Report officially determined that Plaintiff's conduct caused her supervisor to suffer "serious health complications" culminating in a heart attack.

167. These findings were adopted by Defendant Solares García and served as the official basis for Plaintiff's termination on February 21, 2025.

168. The accusation that Plaintiff caused her supervisor's heart attack constitutes a stigmatizing charge of serious misconduct involving bodily harm and moral culpability.

169. The stigmatizing findings were memorialized in official municipal records and, upon information and belief, were disseminated beyond confidential deliberative channels, including to municipal employees and agents, and were echoed and amplified through social media communications administered by municipal employees or contractors acting under color of state law.

170. Plaintiff's termination constituted a tangible alteration of her legal status as a career municipal employee.

171. The combination of false stigmatizing accusations and termination seriously damaged Plaintiff's standing in the community and impaired her ability to pursue her occupations, including public service and religious ministry.

172.    Plaintiff was not afforded a meaningful opportunity to clear her name. The disciplinary process relied on undisclosed written declarations, denied Plaintiff the opportunity to confront adverse witnesses, and adopted credibility determinations unsupported by physical evidence.

173.    By publicly making false and stigmatizing accusations in connection with Plaintiff's termination without providing constitutionally adequate process, Defendants deprived Plaintiff of a liberty interest protected by the Fourteenth Amendment.

174.    Defendants acted under color of state law and with deliberate indifference to Plaintiff's clearly established constitutional rights.

175.    The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

176.    As a direct and proximate result, Plaintiff has suffered economic loss, reputational injury, and emotional distress.

## FIFTH CAUSE OF ACTION:
## CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 USC §1983)

177.    Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

178.    Defendants reached an understanding and engaged in a coordinated course of conduct designed to remove Plaintiff from her career municipal employment in retaliation for her political activity, refusal to support a dominant political faction, and protected whistleblowing activity.

179.    The objective of the coordinated conduct was to manufacture and formalize a disciplinary record that would justify Plaintiff's removal while insulating Defendants from liability.

180.    Beginning in or about January 2023, Defendants initiated formal disciplinary proceedings accusing Plaintiff of insubordination and speaking negatively about the administration. During those proceedings, Plaintiff asserted that she had filed a complaint with OSHA and was being treated differently thereafter.

181.    Despite the progressive discipline framework acknowledged in the March 29, 2023 Hearing Officer's Report, Defendants continued to escalate scrutiny and disciplinary actions against Plaintiff in the months that followed.

182.    On December 3, 2024, the same day Plaintiff's supervisor suffered a medical emergency, stigmatizing accusations portraying Plaintiff as morally corrupt and responsible for harm were published on social media administered, upon information and belief, by municipal employees or contractors acting under color of state law.

183. Those social media accusations preceded the completion of any formal investigation and tracked the factual narrative later adopted in the disciplinary findings that culminated in Plaintiff's termination.

184. The premature public dissemination of that narrative supports the inference that the disciplinary theory was formed and communicated in advance as part of a coordinated effort and was not the product of a neutral or independent investigation.

185. In the ensuing disciplinary proceedings, Defendants relied on undisclosed written declarations, denied Plaintiff the opportunity to confront adverse witnesses, disregarded exculpatory testimony, and adopted credibility determinations unsupported by physical evidence.

186. The February 18, 2025 Hearing Officer's Report recommended termination, and Defendant Solares García adopted that recommendation without independent review.

187. The actions described above were not isolated personnel decisions but sequential and mutually reinforcing steps that required communication and coordination among the Mayor, the Director of Human Resources, the Hearing Officer, and municipal agents involved in the administration of the social media page.

188. Each Defendant performed a distinct role necessary to achieve the shared objective of removing Plaintiff from employment, including initiating charges, shaping the

disciplinary narrative, conducting or overseeing the hearing process, disseminating stigmatizing accusations, and ratifying the final termination decision.

189.    The coordinated conduct was undertaken not as neutral administrative decision-making, but in furtherance of political and retaliatory objectives distinct from legitimate municipal interests.

190.    As a direct and foreseeable result of this coordinated course of conduct, Plaintiff was terminated from her employment and deprived of her constitutional rights under the First and Fourteenth Amendments.

191.    Defendants acted under color of state law and with deliberate indifference to Plaintiff's clearly established constitutional rights.

192.    The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

193.    As a proximate result of Defendants' conspiracy, Plaintiff was illegally terminated from her employment and was caused irreparable and continuing emotional and economic harm, including economic loss, reputational injury, emotional distress, and deprivation of constitutional protections.

## SIXTH CAUSE OF ACTION:
## CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 USC §1985(3))

34

194. Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

195. At all relevant times, Plaintiff is a woman and a Christian pastor who leads a church congregation in Añasco, Puerto Rico.

196. Plaintiff was subjected to hostility, harassment, and adverse governmental treatment because she is a female religious leader.

197. Upon information and belief, Defendants entered into an agreement or understanding to target Plaintiff on the basis of her sex and religion and to deprive her of the equal protection of the laws and equal privileges secured by the Constitution.

198. In furtherance of this agreement, Defendants engaged in coordinated actions including, but not limited to:

- Bullying and harassment directed at Plaintiff in her capacity as a female pastor;

- Denial of permits or authorization to conduct prayer meetings in the public plaza, while permitting comparable secular or political uses of the same public space;

- Public dissemination or amplification of stigmatizing accusations tied to Plaintiff's religious identity;

- Initiation and escalation of disciplinary proceedings leading to her termination;

- Ratification of those disciplinary findings despite the absence of physical evidence and the denial of meaningful procedural protections.

199.     On December 3, 2024, a Facebook page administered, upon information and belief, by municipal employees or contractors acting under color of state law published statements portraying Plaintiff as spiritually corrupt and responsible for harm to another individual in connection with her role as a pastor.

200.     The identifying comments accompanying that publication named Plaintiff explicitly and amplified the accusations in explicitly religious terms.

201.     The dissemination of those accusations occurred contemporaneously with the development of the disciplinary theory later adopted in the February 18, 2025 Hearing Officer's Report.

202.     The actions described above were undertaken with discriminatory animus toward Plaintiff as a woman and as a religious leader, and were intended to interfere with her constitutional rights, including her rights under the Free Exercise Clause, the Equal Protection Clause, and the Due Process Clause of the Fourteenth Amendment.

203.     Defendants committed overt acts in furtherance of this conspiracy, including denial of access to public facilities for religious activity, public dissemination of stigmatizing accusations, and termination of Plaintiff's employment.

204.     As a direct and foreseeable result of Defendants' conspiracy, Plaintiff suffered loss of employment, economic harm, damage to her professional and religious standing, emotional distress, and deprivation of constitutional rights.

205.    Defendants' conduct was knowing, willful, malicious, and undertaken with invidiously discriminatory animus based on sex and religion.

206.    The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

207.    Plaintiff is entitled to compensatory damages, punitive damages as permitted by law, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## SEVENTH CAUSE OF ACTION:
## WHISTLEBLOWER RETALIATION (Puerto Rico Act No. 115-1991)

208.    Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

209.    Plaintiff provided information and made complaints to governmental authorities regarding unsafe working conditions and irregular municipal practices, including complaints to the Puerto Rico Occupational Safety and Health Administration and the Office of the Comptroller.

210.    Plaintiff's disclosures were protected under Puerto Rico Act No. 115-1991.

211.    Following and because of these protected disclosures, Defendants subjected Plaintiff to adverse employment actions, culminating in her termination.

212.    Defendants' actions violated Puerto Rico Act No. 115-1991.

37

213.     The foregoing violations are attributable to the Municipality because they were committed by the Mayor in his capacity as final policymaker and/or pursuant to a longstanding municipal custom of political patronage and retaliation.

214.     As a direct and proximate result, Plaintiff suffered loss of employment, economic harm, and emotional distress and is entitled to the remedies provided by law, including double damages.

### LOCAL ADMINISTRATIVE REMEDIES AND TOLLING

215.     Plaintiff timely appealed her dismissal to the Puerto Rico Public Service Appellate Commission (Comisión Apelativa del Servicio Público), the administrative body with jurisdiction to review disciplinary actions against municipal employees.

216.     Plaintiff also timely appealed a prior disciplinary action taken against her after she filed complaints with OSHA for unsafe and unhealthy working conditions at the Municipal Cemetery.

217.     Plaintiff's administrative appeals remain pending and undecided.

218.     CASP proceedings are subject to significant and well-documented delays, and appellants routinely wait several years for a final determination.

219.     While CASP may adjudicate matters within its statutory authority, it lacks jurisdiction to resolve federal constitutional claims, award damages under 42 U.S.C. § 1983,

38

award attorneys' fees under 42 U.S.C. § 1988, or grant the full injunctive and monetary relief sought herein.

220.    Plaintiff is not required to exhaust administrative remedies before bringing claims under 42 U.S.C. § 1983. To the extent exhaustion or finality is deemed applicable to any supplemental Puerto Rico law claims, the pendency of Plaintiff's administrative appeal and the extraordinary delay inherent in that process toll any applicable limitations periods as a matter of law and equity.

221.    Plaintiff brings this action without waiving her administrative appeals and expressly reserves all rights and remedies in both forums.

### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

222.    Plaintiff repeats and incorporates all the allegations contained in paragraphs 1 through 129 as if set forth fully herein.

223.    Plaintiff seeks preliminary and permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65 to prevent ongoing and future violations of her constitutional rights and the rights of similarly situated municipal employees.

224.    Defendants have demonstrated a pattern of political retaliation, misuse of disciplinary authority, and extrajudicial harassment that presents a real and immediate threat of ongoing or future constitutional violations, including through the use of digital media administered by municipal employees or contractors.

39

225.     Plaintiff is likely to succeed on the merits of her claims, including political discrimination, retaliation, denial of due process, conspiracy, and municipal liability.

226.     Plaintiff has suffered and continues to suffer irreparable harm, including chilling of First Amendment rights, reputational injury, impairment of professional and religious standing, and deterrence of protected activity, for which monetary damages alone are inadequate.

227.     The balance of equities weighs in Plaintiff's favor, as Defendants have no legitimate interest in continuing unconstitutional practices, while Plaintiff and the public have a compelling interest in lawful, merit-based public administration.

228.     The public interest is served by enjoining political patronage, retaliation, and coercion in municipal government, protecting constitutional rights, and restoring confidence in democratic institutions.

229.     Plaintiff requests a preliminary and permanent injunction prohibiting Defendants, their agents, employees, and contractors from:

   a. Using official authority or municipal resources to retaliate against municipal employees based on political affiliation, religious identity, or protected activity;

   b. Employing sham disciplinary proceedings or investigative processes to manufacture pretextual grounds for adverse employment actions;

c.  Using social media or other public communications administered by or on behalf of the Municipality to harass, intimidate, stigmatize, or retaliate against employees in connection with protected conduct.

230.    Plaintiff also seeks declaratory relief declaring Defendants' conduct unconstitutional and unlawful.

### DAMAGES

231.    As a direct and proximate result of Defendants' unlawful acts, Plaintiff has suffered and continues to suffer substantial economic and non-economic damages and seeks make-whole relief sufficient to restore her, as nearly as possible, to the position she would have occupied absent the constitutional violations.

232.    Plaintiff's damages include, but are not limited to:

a.  Back pay, including lost wages, step increases, differentials, and overtime;

b.  Front pay sufficient to compensate Plaintiff for lost future earnings and retirement accrual in lieu of reinstatement, if reinstatement is deemed impracticable due to Defendants' open and documented hostility against Plaintiff;

c.  Loss of accrued leave, benefits, and seniority;

d.  Loss or diminution of retirement and pension rights, including accrued service credits, eligibility status, vesting, contribution matching, annuity calculations, and survivor benefits;

e.  The monetary value of employer and employee contributions that would have been made to Plaintiff's retirement system but for her unlawful termination;

f.  Out-of-pocket expenses and economic losses resulting from the interruption of Plaintiff's public service career;

g.  Severe emotional distress, including anxiety, humiliation, loss of sleep, damage to her standing in the community, and emotional anguish arising from:

1)  the retaliatory termination of her twenty-four-year public service career;

2)  the loss of retirement security earned over decades;

3)  the public stigmatization and false accusations that she caused her supervisor's heart attack;

4)  the use of municipal authority and digital media to portray her as morally corrupt and dangerous; and

5)  retaliation for her political independence, religious identity, and protected whistleblowing activity.

h.  Punitive damages against the individual Defendants for their malicious and willful violations of and callous disregard for Plaintiff's constitutional rights, including knowingly adopting and ratifying false and stigmatizing findings, escalating disciplinary proceedings for retaliatory purposes, and publicly attributing to Plaintiff serious bodily harm to others without evidentiary support.

i. Double damages against the individual Defendants for whistleblower retaliation in violation of Puerto Rico Act No. 115-1991.

j. Attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and applicable Puerto Rico law.

k. Any other and further relief as may be deemed just and proper.

233. Plaintiff further seeks equitable relief designed to make her whole with respect to retirement benefits, including, as appropriate:

a. An order restoring Plaintiff's service credits, vesting status, and seniority for all periods of unlawful separation;

b. An order requiring Defendants to fund or credit Plaintiff's retirement account as if she had remained continuously employed;

c. Alternatively, an award of monetary compensation reflecting the actuarial value of lost retirement benefits, to be determined through expert testimony;

d. Any additional equitable or monetary relief necessary to place Plaintiff in the position she would have occupied absent Defendants' misconduct.

234. Plaintiff seeks a tax-component gross-up or other equitable relief necessary to offset any increased tax liability caused by the lump-sum receipt of multi-year lost compensation.

235.    Plaintiff also seeks expungement of the stigmatizing findings from her personnel record and a name-clearing order.

## JURY DEMAND

236.    Plaintiff demands trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find that the Defendants violated Plaintiff's rights, enter judgment in her favor, and grant all relief requested herein and any other relief to which she may be entitled in law or in equity.

In San Juan, Puerto Rico this 17th day of February 2026.

Respectfully submitted,

**PEDRO ORTZ ÁLVAREZ, LLC**
*Attorneys for Migdalia Feliciano Martiz*
P.O. Box 9009
Ponce, PR 00732-9009
Tel (787) 758-9356
Fax (787) 758-9243

*/s/ Gina Ismalia Gutierrez-Galang*
**GINA ISMALIA GUTIERREZ-GALANG**
USDC-PR No. 218513
ismalia.gutz@gmail.com
ismalia@poalaw.com

44